By the Court.—Neilson, J.
This action was brought to recover six thousand five hundred dollars, *202 claimed to have been lent and advanced by the plaintiff to the defendants. The answer denied the making of the loan or advance, thus presenting the only issue of fact arising on the pleadings.
The allegation and the denial of indebtedness went to a mere legal inference or conclusion (Fosdick v. Groff, 22 How. Pr., 158).
On the hearing before the referee, it appeared that on February 9, 1870, the plaintiff, who held and owned the check of Mayor Kalbfleisch for seven thousand dollars, indorsed and delivered it to the' defendants, and received of them their three checks; one for one hundred and fifty dollars, one for three hundred and fifty dollars, and the other for six thousand five hundred dollars. The two former, intended for present use, were paid ; the latter, not to be directly paid, was noted on its face as a 'memorandum check.
On the trial before the referee, that memorandum check was properly received in evidence, under the general objection that it was irrelevant. FTo question was raised as to the form of the complaint, a general count for money lent and advanced, or as to the mayor’s check being regarded as, in effect, equivalent to money. The questions contested on the trial were as to the undertaking of the defendants in giving this check, and whether that undertaking had been qualified by the relation which the witness, McBain, had to the original transaction, or was afterwards satisfied by McBain’s having received money of the defendant.
The memorandum check is of modern use: a form of contracting where immediate payment at the bank is not contemplated, or a more formal contract not considered necessary. But, in view of its having been a late contrivance, coming into use after the rules peculiar to checks in the unqualified form and to strictly commercial paper had been well settled, and of its depending somewhat upon usage or custom, *203 it is not surprising that the courts and the text-writers have not been in perfect accord as to this peculiar contract.
In a leading case in this State (Dykers v. Leather Manufg. Bank, 11 Paige, 612), the custom of Wall-street had been proved to the effect that the memorandum indicated an understanding that the check should not be presented at once, or while the drawer ha,d no funds at the bank, and so injure his credit. In that case the letters “ memP had been put on the corner of the check without the knowledge of the party to whom it was given, and were not noticed by the teller of the bank when payment was made. That payment was approved. But, in addition to the fact that the drawer was in funds at the moment, it appeared that the payee had held the check for some days. Even the Wall-street custom might well have been thus met and satisfied. But the chancellor regarded that custom as objectionable ; as an attempt by the mem. to convert “ an ordinary check on a bank into something contrary to its legal effect,” and held that the mem. did not affect the negotiability of the check, or the holder’s right to immediate payment.
If the custom in aid of the memorandum were invoked “to change the check into something contrary to its legal effect,” the objection would be insuperable. A custom should not be in conflict with the rules and principles of law. A contract is to be respected, not only in view of its terms, but of its legal effect; and that legal effect can no more be changed or contradicted by parol than its express terms may be. The check on a bank states no day for the presentation or payment of it, but the law supplies the omission, and what the law supplies is, in effect, part and parcel of the contract.
In the absence of such an objection, the custom or usage may perform an important office, especially *204 where the parties have contracted with reference to it, where its nature and effect are just and reasonable, or where the meaning of words or phrases which have acquired some special or technical sense in trade or commerce, becomes material. But, going beyond such instances, the right to call in the usage or custom is exceptional, and of little value. If, pushing the claim to the extreme, it should be said that much of what is now regarded as settled law, many rules and presumptions acted on by bankers and merchants, had their origin in mere experience, in the wants and convenience of men as exemplified in trade or commerce ; that, in the progress of a gradual development, usage had ripened into custom, custom into law;—first the blade, then the ear, then the full corn in the ear ;—that though we cannot add to the common law, there may be expansions and novel applications of that law, and that it might not be wise to assign arbitrary limits to that development, or to act upon the assumption that the usage or custom of more recent origin may not be as reasonable, as well adapted to the nature and fitness of things as the customs which have long since received general adoption, — still restraints and limitations would be met with at every step in the argument. In accepting any new application of a principle, as illustrated by usage or custom, that which has been already established must remain; the new may not be built upon the ruins of the old.
The first step, therefore, towards the recognition of the custom in question, is to give significance to the fact that the word “memorandum” thus written on the face of the check is a part of the contract. In this instance that word was written by the drawer when the check was made and delivered. The parties knew what was intended ; what the memorandum signified. Why does that word appear on the face of the paper ? It was written for some purpose,—for what purpose % *205 May it not be read in connection with, the other words in the light of the well known custom ; not indeed as a word having no special sense, or as hostile to the contract, but to carry out the intention of the parties by giving effect to what has been written ? If the custom cannot work out that, it performs no office whatever, and the memorandum on the face of the check goes for .nothing.
■ The objection that the custom seeks to give such effect to the memorandum as to convert the common check on a bank into something else, thus changing the legal effect, presupposes that a check in the common form has been made, and is thus sought to be transformed. With deference, that view is erroneous. It may be assumed that this memorandum check was made as such instruments usually are. The defendants did not make a common check to be changed to something else, but made this check in the form in which it now appears. The objection due to the act of altering the contract by adding, erasing, or tearing off words and terms, or of bringing in by the custom, or otherwise, something extraneous to subvert or modify the contract, does not apply. The question would rather seem to be, whether a portion of what the parties thought proper to add or annex, as part of the instrument, can be overlooked, and a change not contemplated by the parties be thus imposed.
The argument, if not the ruling, in Dykers v. Leather Manuf. Bank (supra), repels the notion of distinguishing between the special and common check.
That distinction, recognized in Skilman v. Titus (3 Vroom, 96), was clearly stated in Franklin Bank v. Freeman (16 Pick., 535). In the latter case (p. 539 of op.), Mr. Justice Putnam says: “A memorandum check is a contract by which the maker engages to pay the bona fide holder absolutely, and not upon a condition to pay if the bank upon which it be drawn should *206 not pay upon presentation at maturity, and if due notice of presentation and non-payment should be given. The word ‘ memorandum,’ written or printed upon the check, describes the nature of the contract with precision.”
Some elementary writers, in stating the rule that custom or usage is not respected if contrary to the law applicable to contracts, assume that the custom as to memorandum checks is within that rule. Other and later writers take quite another ground.
In Story on Prom. N, § 499, it is said that these memorandum checks, as between the parties thereto, seem designed as mere evidence of indebtedness, and are in the nature of the common due bill.
Edwards, in his work on Bills and Notes (2 ed., 754), has a like statement.
And Mr. Parsons, referring to the ruling in Dykers v. Leather Manuf. Bank (supra), that the mem. written on the check does not affect the rights of the holder, says: “We think this might have been doubted, because there is a well known custom in all our commercial cities of drawing and using checks in this form merely as due bills” (3 Pars, on Notes and Bills, 66).
And a yet later writer says : “ Memorandum cheeks, so called, are instruments of quite common use in business circles.' .... As between the drawer and the drawee they are a species of evidence of indebtedness” (Morse Treat, on Banks and Banking, 313).
But it may be stated that with us the memorandum check is negotiable, and, if presented at the bank when the drawer has funds, may be paid as other checks may be ; that no term of credit can be imputed, preventing the holder from exacting payment within a reasonable time ; and that the memorandum operates as a waiver of presentment and notice, the contract being an unconditional engagement to pay the money. *207 It would seem to follow, that in other respects the memorandum inures to the benefit of both parties. The party receiving such a check could not, as in the case of a check proper, claim that he had been defrauded, if the drawer had no money in the bank to be applied in payment; nor could the drawer claim to be relieved from his obligation by reason of negligence, should the bank fail, after reasonable time for the presentation of the check had elapsed. These, and the like consequences, result from the waiver of which the “ memorandum” is declarative.
The contention in this case having been between the parties to the original transaction, the consideration for which this momorandum check was given, was open to inquiry. That consideration having been sufficient, and there having been neither fraud nor mistake, the defendants who had signed their names as principals, became bound as such. It was no more competent for them to show that although they had given their three checks for, and on receiving the seven thousand dollars, it was then and there understood and agreed, that they should not pay the checks, or. that McBain should pay them, than it would be for the maker of a promissory note, by such proof, to relieve himself from all liability.
The theory of the defense was, that the loan had been made to McBain, or to the defendants by and for him; and with that view, proof was taken as to his having been instrumental in inducing' the plaintiff to get the money of the mayor to be placed with the defendants. But that loan was obtained by the plaintiff of the mayor, upon his own note, and the pledge of his collateral securities. McBain had no interest whatever in the check, and no claim upon its proceeds ; and his application to the plaintiff to make the loan, seems to have been on behalf of the defendants. But no question of agency was involved. After obtaining the *208 mayor’s check, the plaintiff met one of the defendants in the register’s office, and transacted the business with him personally, by delivering that check, and receiving of the defendants their three checks—an exchange of paper. At the moment of that exchange, the rights and obligations of the parties were fixed unconditionally.
The plaintiff’s understanding was, that the defendants wanted to improve the appearance of their bank account. He says that McBain and Fish so represented. Even McBain, called as a witness, says, “I said to Mr. Turnbull that I wanted the money to place with Osborn & Fish. I told him that I was under obligations to them, and wanted to place it there. My intention in putting the money there was to do them a favor so that their bank account would stand better.”' All that was quite consistent with a friendly interest in the defendant’s standing at the bank, and with the fact that the money going from the plaintiff to them for their accommodation, was to be repaid by them.
The statement of McBain, that he placed the money with the defendants, cannot be reconciled with the conceded events, the controlling facts in the case.
The intent of the parties, the character of the transaction, and the consequent claim and liability, are best deduced from the papers exchanged. But that intent could also be gathered from the proofs at large, from the acts and the omissions. ■ If this was a loan ‘to Mc-Bain, what occasion was there for the intervention of the defendants ? Why did not he, rather than they, receive the mayor’s check and give the plaintiff his checks for the two small sums, his memorandum check for the balance % If this were not a loan to the defendants, why did they receive the seven thousand dollars of the plaintiff and give their checks in exchange ?
The testimony taken with a view to substitute Mc-Bain as the debtor in the place and stead of the defend *209 ants, was in no sense material. In McBain’s testimony, he attempts to take the attitude of a debtor, to give assurances of payment, but he has not paid the debt. If a debtor at all, he was so to the defendants, for the money received of them. Of what moment was it that his memorandum check was mentioned, perhaps considered desirable security, the plaintiff having accepted the defendant’s check, McBain assuming no responsibility ? Of what moment that McBain said he would pay the interest charged by the mayor, he not having bound himself to pay the principal and interest now in question ?. Or that, immediately upon the exchange of the paper, Fish spoke of letting McBain have the money, did let him have three thousand five hundred dollars that day, and the residue soon afterwards? Or that, without the plaintiff’s interference or power of control, they kept their accounts in the manner stated ? If the defendants had regarded the money advanced to McBain as in payment of the plaintiff’s claim, they should have obtained his express consent to that, have taken up this check, and required Mc-Bain to give or substitute some other security. As prudent men, they would have done so.
Upon the exchange of the papers, the defendants acquired title to the check for seven thousand dollars, and had the power to apply the money as they thought proper. Whatever use they may have made of it, their obligation to pay the amount represented by this memorandum check remained as an original and unqualified undertaking.
We think that the judgment entered on the referee’s report should be reversed, and a new trial granted, costs to abide the event.
Judgment accordingly.