THE PEOPLE *ex rel.* MARTIN B. BROWN *against* ANDREW H. GREEN, °COMPTROLLER OF THE CITY OF NEW YORK.

Under the act of 1870 (1 L. 1870, c. 190, § 6), in regard to the payment of claims against the city of New York—by which it is provided that the finance department of the corporation shall have the like powers and perform the like duties in regard to the fiscal concerns of the board of supervisors as it does in regard to the corporation, and that all moneys drawn from the treasury by authority of the board of supervisors shall be upon vouchers for the expenditure thereof, examined and allowed by the auditor and approved by the comptroller—the power given to the auditor does not authorize him to reject a claim against the county for supplies, which has been duly audited and allowed by the board of supervisors, merely on the ground that the goods furnished were not worth the sum allowed for them by the supervisors, unless the amount is so great as to warrant the conclusion that there must have been corruption or mistake.

He may, however, reject a claim duly allowed by the board of supervisors, if it appear by the vouchers or receipts on file in his office that the claim has already been paid.

The meaning of the terms "voucher" and "audit" defined. Per DALY, Ch. J.

By the common law auditors have no power to pass upon questions of law or fact disputed before them.

APPEAL from an order of this court made at special term, directing a peremptory writ of *mandamus* to issue.

The relator moved for a *mandamus* upon affidavits showing that he was a stationer, and had furnished books, stationery, printed calendars, etc., for the various courts and public offices in the city of New York, and that his bills for the same had been presented to the full board of supervisors, and audited

and allowed by them at the sum of $6,927 02.   That at the time of such allowance there existed appropriations of moneys sufficient to pay such amount, and enable the whole of it to be drawn from the county treasury.   That vouchers for all such services and supplies had been presented to the finance department, and to Andrew H. Green, the comptroller of the city of New York, and that he had been requested to examine and allow the same at the sums settled by the board of supervisors, but that he had refused to so audit them or to pay the claims. The affidavit also contained a schedule of the claims, with the date and amount of their allowance by the board of supervisors.

In response to these affidavits, there was submitted, on the part of the comptroller, an affidavit made by Abraham L. Earle, stating that he was the auditor of accounts in the finance department of the city of New York; that the claims of the relator had never been examined and allowed by himself or by any of his predecessors in office.

He also stated, in regard to the first item in the relator's schedule (which was "for printing and blanks supplied by deponent to the bureau of elections, $390 10"), that it was for wrapping and delivering blanks furnished for the use of the bureau of elections.   That such blanks were furnished pursuant to a contract fixing the prices therefor.   That in the relator's bill therefor was included the aforesaid item of $390 for printing and delivery thereof in addition to the contract prices. That thereupon, on settlement and adjustment of said claim, said item was disputed, and the auditor refused to audit the same, contending that the contract price covered the expense of wrapping and delivery, and thereupon the relator's bill for the printing and blanks was adjusted, audited and paid in full after deducting said disallowed item of $390 therefrom, and the relator's claims in that behalf fully settled.

He further stated that the relator's claims included bills mainly for printing furnished to the district attorney, surrogate and Court of Common Pleas, Marine Court and bureau for collection of personal taxes, amounting in the aggregate to the sum of $2,532 89, and that such supplies were worth only $2,499 89, and no more.   That said bills were mainly payable from the

appropriation for "printing for executive departments and judiciary," and only the sum of $350 12 was then unexpended to the credit of said appropriation, and there was no other or greater sum in the treasury of the county of New York appropriated or applicable to the payment of said bills.

He further stated, in relation to the item of $1,810 40, for printing done for the board of supervisors, that said printing was justly and reasonably worth only the sum of $1,802 65, at which sum he was ready and willing to audit the same if the relator desired that he should so audit.

He further stated that the relator's claims included sundry bills for stationery, etc., amounting in the aggregate to the sum of $1,628 43; that the articles enumerated in said bills were justly and reasonably worth only the sum of $1,605 75, at which sum he was ready and willing to audit the same if desired by the relator.

The court at special term delivered the following opinion:

ROBINSON, J.—I concur in the opinion of Judge JOSEPH F. DALY, in the *People ex rel. Haskell* v. *Green, Comptroller*, that the action of the board of supervisors in auditing and allowing claims against the county for county charges, duly presented and acted upon by that body, is final, and not subject to review by the auditor of accounts, and that his and the comptroller's action is confined to a mere examination and allowance of the proper vouchers, as affording satisfactory evidence of the nature of the claim, its presentation and due verification (as required by L. 1845, chaps. 180, 524, as amended by L. 1847, c. 490, § 2), and the action of this board thereon (6 Lans. 30).

This consideration answers all the objections to the payment of the claim of the relator, except to $2,532 59 for printing, as to which it is asserted but $350 12 remains unexpended of the appropriation out of which it can be paid. As to this, an alternative *mandamus* ought to issue, but as to the other claims, a peremptory writ should be allowed.

*E. Delafield Smith,* for appellant.

I. The audit, and the allowance of the relator's bill by reso-

lution of the board of supervisors, is not sufficient to authorize payment by the comptroller. (*a*) Chap. 190, § 6, of the Laws of 1870 provides that "the finance department of the mayor, aldermen, and commonalty of the city of New York shall have the like powers and perform the like duties in regard to the fiscal concerns of the board of supervisors, as the said department possesses in regard to the concerns of the said mayor, aldermen, and commonalty of the city of New York," and that "all moneys drawn from the treasury by authority of the board of supervisors, shall be upon vouchers for the expenditure thereof, examined and allowed by the auditor and approved by the comptroller."

The powers and duties of the finance department in relation to the fiscal concerns of the mayor, &c., of the city of New York, which, by the statute, were extended over and made applicable to the fiscal affairs of the county, are defined in article fifth of the charter (L. 1870, c. 137, §§ 33–39).

The provisions of the statute as to adjustment, audit, and payment of bills and accounts are briefly as follows, viz.: 1. The finance department is directed to settle and adjust all claims in favor of or against the corporation, and all accounts in which the corporation is concerned as debtor and creditor. 2. The auditing bureau of the finance department shall audit, revise, and settle all accounts in which the city is concerned as debtor and creditor. 3. Vouchers for money drawn from the treasury shall be examined and allowed by the auditor and approved by the comptroller.

The charter of 1873 (c. 335, §§ 31 & 33) contains substantially the same provisions.

(*b*) It is conceded that, were it not for the provisions of L. 1857, c. 590, and L. 1870, c. 190, the audit and allowance by the board of supervisors of a bill or claim which was a proper and legal county charge, would be final and conclusive, and the county treasurer would be obliged to pay in accordance therewith (*People* v. *Lawrence*, 6 Hill, 244; *People* v. *Supervisors of Dutchess*, 9 Wend. 508). But these statutes introduced an entire change as to the powers of the board of supervisors in relation to the audit and allowance of bills and the payment of

claims against the county. A new check was created, and a
new safeguard thrown around the county treasury by the pro-
vision that every claim against the county should be adjusted,
revised, and settled by the auditor of accounts in the finance
department, and should be paid only upon vouchers for the ex-
penditure, examined and allowed by the auditor, and approved
by the comptroller. The power to direct payment by the
county treasurer of a specific sum, for a liability of the county,
was thus taken from the board of supervisors. They might
authorize the purchase of supplies needed for county purposes,
but the audit and adjustment of the bill therefor, and the ex-
amination of the voucher for the expenditure, was committed
to the auditor's bureau in the finance department. The resolu-
tion of the board of supervisors is necessary to authorize the
purchase, but an adjustment and audit by the finance depart-
ment is necessary to fix the amount of the claim (*People* v. *Flagg*,
15 How. 553; *People* v. *Flagg*, 17 N. Y. 589).

  *A. Oakey Hall*, for respondent, relied on *People ex rel.
Kelly* v. *Haws* (12 Abb. Pr. 200–202) and *People ex rel. Haskell*
v. *Green* (MSS. opinion by Judge J. F. DALY, of this court, at
special term).

  DALY, Chief Justice.—As respects the question presented
upon this appeal, the provisions of section 6 in the act of 1857
(2 L. 1857, p. 286), and of section 6 in the act of 1870 (1 L. 1870,
p. 482), are substantially the same. A construction was given to
the provision of section 6, in the act of 1857, by Judge
SUTHERLAND, in *The People ex rel. Kelly* v. *Haws* (12
Abb. Pr. 201, 202), which is equally applicable to the pro-
visions in section 6 of the act of 1870. That construction is
that it was not the intention of this provision to give the offi-
cers of the finance department an absolute supervisory power
over the acts of the board of supervisors, in examining, settling,
and allowing accounts against the county, which would be
equivalent to an absolute veto check over the discretionary
power of the board of supervisors. That the provision that all
moneys drawn from the treasury upon the *authority* of the

board of supervisors shall be upon *vouchers* to be *examined* and *allowed* by the auditor and approved by the comptroller, means that it is the board of supervisors who are to determine whether the service was performed or the expense incurred.

I agree only in part in this construction, for, in my judgment, to examine, allow and approve a voucher means something more. What is a voucher? The word has several meanings; but, in its ordinary signification, it means a document which serves to vouch the truth of accounts, or to confirm and establish facts of any kind. A merchant's books are the vouchers of the correctness of his accounts, or a receipt is a voucher of a payment, but neither are conclusive. "To vouch" is to aver that a thing is true. "It is," says Crabbe, "to rest the truth of another's statement upon our own responsibility" (Crabbe's Synonymes, p. 441, Am. ed. of 1833). The voucher of the board of supervisors is that the claim or account submitted to them is correct, and should be paid as a valid charge against the county. But it cannot be paid unless the voucher is examined and allowed by the auditor and approved by the comptroller. Now what does this mean? The voucher is necessarily the account or claim, with the attestation, in some form or other, of the board of supervisors, that it is a valid charge against the county. It is presented to the auditor for examination. What is he to examine? Is he simply to ascertain whether the attestation, or other evidence of the action of the board of supervisors, is in the proper form and duly certified by the proper officer? The statute says he is to examine the voucher, and the account or claim is part of the voucher. A certificate of the action of the board of supervisors would be meaningless without the bill or account, for that has to go on file in the comptroller's office as the record evidence of the claim or demand. The examination of the voucher, then, necessarily means the examination of the account or claim, and if, upon looking into the account, the auditor discovers that a mistake has been made in the addition—that the items correctly added up do not amount to the sum claimed and certified to be correct by the board of supervisors, what is the auditor to do? Is he to allow the voucher and hand it over to the comptroller,

and is the comptroller, with the knowledge of that fact, to approve of it? In my judgment, if the auditor, upon examining the account, finds any mistake in it, he is not to allow it, nor is the comptroller to approve of it.

What is an auditor? Originally it meant an officer of the king, whose duty it was, at stated periods of the year, to examine the accounts of inferior officers and certify to their correctness (Blount's Dictionary of 1681; Cotgrove's Dictionary of 1632; Rastall's Termes de la Ley; Defoe's English Dictionary of 1732), and was afterwards used to designate those officers of the Court of Exchequer whose duty, according to Coke, was to take the accounts of the receivers of the king's revenue and "audit and perfect them," without, however, putting in any changes, their office being only to audit the accounts—that is, ascertain their correctness (4 Coke's Inst. 107). The very object of examining and auditing an account is to ascertain whether there are any errors or mistakes in it, and hence the definition of the verb "to audit," which is to examine, settle and adjust accounts—to verify the accuracy of the statement submitted to the auditing officer or body (McElrath's Com. Dict.) "At the present day," says Wedgwood, one of the last writers upon the meaning of English words, "this term is confined to the investigation of accounts, the examination and *allowance* of which is termed the *audit*."

The act of 1857 declares that the finance department shall have the control of all the fiscal concerns of the corporation, and shall adjust and settle all claims and accounts either in favor of or against the city. The county, as contradistinguished from the city—for both embrace exactly the same territory—is a part of the political organization of the State, for which, as in all the other counties, a board of supervisors was created with analogous powers. By the act of 1857, this board was changed and limited to twelve supervisors, elected by the people, the mayor and recorder being excluded. This act further provided that a majority of *all* the members of this new board should be necessary to pass any act, ordinance or resolution appropriating money, and that such act should be presented to the mayor for his approval, who should sign it, or else return it with his ob-

jections, when, after a certain time, it might be reconsidered by the board of supervisors, and if again approved by a majority of all the members, it should take effect. All this was, at that time, essential to a valid appropriation of money, except in the case of levying a special tax; but something more was required before it could be paid. The act declared that the finance department and its *officers* should have the like powers and perform the like duties in regard to the fiscal concerns of the *board of supervisors* as they possessed in regard of the local concerns of the corporation—that is, as already quoted, "to adjust and settle" all claims, &c., which was inserted in the 17th section, immediately preceding the provision for the examination and allowance by the auditor and the approval by the comptroller of vouchers. This was giving to the finance department and its officers the same powers in respect to the fiscal concerns of the county which they already had in regard to the fiscal concerns of the city, and it appears to me to be a plain disregard of this enactment to hold that the auditor and the comptroller, who are officers of the present finance department, have no power to consider any of the items in the bill or claim which forms a part of the voucher, but must allow and approve the voucher, if duly certified as the act of the board of supervisors, although these officers may know that there are items in the account, bill or claim which are erroneous. If this is to be the construction, then what did the Legislature mean by enacting that these officers should have the power and that it should be *their duty* "to adjust and settle" claims against the county? "To adjust" is to set right (Smyth's Synonyms Discriminated, Am. ed. p. 37), and "to settle" is either synonymous with "to adjust," or it means "to pay" (Webster's Dictionary, unabridged ed. of 1864).

I suppose the true construction of the act of 1857 to be, that the authority to appropriate money for the payment of claims against the county was vested exclusively in the board of supervisors; but even when appropriated, that the claim was not to be paid until it was examined and allowed by the auditor, and approved by the comptroller. That there was a supervisory power vested in these officers, which was meant to

be-a check upon any hasty, ill advised, and erroneous appropriation by a popular body, constituted like the board of supervisors; and certainly the enormous frauds that were consummated, with the approval and authority of these assumed guardians of the public money after this law was enacted, show that even its provisions were insufficient to protect the county from the corruption and profligacy with which its fiscal affairs were administered by those who had the control of them.

It may be asked, if the auditor will not allow, or the comptroller approve, a claim which is a valid charge against the county and ought to be paid, what is the claimant to do? The answer is, that he has a remedy by mandamus, for the allowance and approval are ministerial duties on the part of the auditor and the comptroller, which they will be required to perform, unless they show, in reply to the writ, that the case is one in which the voucher should not be allowed or approved; for the court may determine whether the act ought or ought not to be performed (Tapping on Mandamus, c. 2 & c. 3, pp. 177, 189).

The affidavit of the auditor sets forth the reasons why he did not allow the voucher, distinguishing the items which he would not allow. For instance, that he would not allow $390 for the wrapping and delivery of the printed blanks for the use of the board of elections, because the wrapping and delivery was included in the contract for the printing; nor $2,532 89 for printing done for certain courts and officers, because the charge was too great by $33—$33 more was charged than it was worth; nor $1,810 40 for printing done for the board of supervisors, because it was worth but $1,802 65; nor $1,628 43 for stationery, because it was worth but $1,605 75; and lastly, that in respect to bills payable from the appropriation for printing for the executive departments and the judiciary, because there was but $350 12 remaining unexpended of that appropriation.

The duty imposed upon the auditor of examining and allowing a voucher does not justify his refusing to allow it, because, in his opinion, certain goods furnished the county, or services

rendered to it, are charged in the account, and allowed by the board of supervisors, for more than the goods and services were worth; unless the overcharge is so gross as to warrant the presumption of corruption, or that it must have been allowed without due examination through error or mistake. This can scarcely be predicated of the three items for printing and stationery, the amount alleged to be in excess of the value in each being relatively small. The first item is $2,532 89, which the auditor claims is $33 more than the printing was worth. The second is $1,810 40, also for printing, in which he claims is $7 75 more than it was worth. The third is $1,605 75 for stationery, which he alleges is $22 68 more than the stationery was worth. He does not specify the particular articles which were overcharged by which he arrives at this sum of $22 68, nor what were the specific charges in the printing by which he arrived at the respective overcharges in each bill, of $7 75 and $33. He does not claim in respect to these three items that there was any express contract by which the price or value could be ascertained or accurately estimated; or show in any way how he arrived at his conclusion that there was an overcharge in the value to the amount specifically stated by him. I do not understand that it forms any part, or ever did, of the duty of an auditor to reduce the value of the goods or of the services charged in an account, by the mere exercise of his arbitrary will. His examination is for the purpose of ascertaining if the bill or account is correct, that any errors or mistakes in it may be rectified. He does not reject the bill or account because he finds errors or mistakes in it; but audits it at its true amount, specifying the errors, and showing by his statement or audit what the correct account is. A bill, account, or claim against the county was not, under the acts of 1857 and 1870, paid by the authority of the auditor or the comptroller, but by the authority of the board of supervisors. As the payment is to be, and can only be by their authority, it was for that body to say whether the price charged for the goods or the value claimed for the services should be allowed or not, and where they have fairly and deliberately done so, the price or the value must be regarded as settled. I mean most dis-

tinctly, however, to say, that where the amount allowed for the service or the goods is so excessive—so notoriously beyond any ordinary standard of value—as to warrant the conclusion that there must have been corruption, the auditor is not to allow the voucher, nor is the comptroller to approve of it; nor would any court compel them to do so. The existence of corruption may be inferred from the amount allowed and the absence of any explanation, and, unfortunately for this city, the instances have been numerous enough to illustrate what I mean. Unless there has been corruption, or enough upon the face of the voucher to warrant the presumption of it, the duty of the auditor is limited to the correction of errors or mistakes, the audit being subject to the approval of the comptroller.

Auditors were never, at common law, or in equity, entitled to pass upon questions of law or fact disputed before them. They stated the accounts between the parties, correcting errors or mistakes; but if any question of fact or of law arose upon the investigation of the accounts, which was disputed, they had to report it for the determination of the tribunal or body by whom they were appointed (*Godfrey* v. *Saunders*, 3 Wils. 94; Buller's Nisi Prius, 128, 5th ed.; 1 Selwyn's Nisi Prius, c. 1; Action of Account, Bacon's Abr. Accompt, F; *Chappelaine* v. *Dechenaux*, 4 Cranch, 306; 5 Binney, 433). In *Field* v. *Holland* (5 Cranch, 20, 21), Chief Justice Marshall held that auditors were agents or officers of the court, who examine the documents, papers or accounts submitted to them. That the order appointing them bears no resemblance to a rule referring a cause to arbitrators. That their duty is simply to report to the court, stating the result of their examination, and does not require them to form any opinion whatever. I cite this, not because the duty of the auditor here is in all respects like that of the auditors formerly appointed in the United States courts, but to show that auditors, whether in the action of account, or in equity, or in the exchequer, or in the United States courts, never decided such questions as to whether the articles or services embraced in the account were of the value charged, or undertook to reduce the amount, because, in their opinion, they were charged at too much, but merely examined the accounts

submitted to them with the accompanying documents and papers, correcting obvious errors and mistakes, and reported to the court what they found the state of the account or accounts to be.

Here the auditor examines the account, not before, but after the action of the body that determines whether the claim is a valid charge, and ought to be paid, and in that examination the same office is performed, the rectification of errors or mistakes, but not the decision of matters which properly belong to the body in whom is vested the authority to order the claim to be paid.

There is nothing in the affidavit of Mr. Earle, the auditor, to warrant the inference that the amounts in the three items referred to were corruptly allowed. As I have said, the alleged excess in each item is small in proportion to the amount, and there is nothing in his affidavit that would entitle the court to say that he was right, upon the ground that these amounts were, or must have been allowed through error or mistake. It was different in respect to the charge for the wrapping and delivery of the printing for the bureau of elections. If it was included in the contract for the printing (and it must be assumed that it was, for the auditor so states, and the fact is not denied), it was clearly a mistake in the board of supervisors to allow it. It appears, moreover, from the auditor's affidavit, that the relator's bill for this item of printing, was adjusted, audited and paid after deducting the $390 for the wrapping and delivery, and that the relator gave a receipt in full, acquiescing in the settlement after the rectification of this error. This claim, however, of $390, is ordered by the mandamus to be paid, which I think was erroneous.

The judge excluded from the peremptory mandamus the claim for $2,532 89, alleged to be payable mainly out of the appropriation for printing for the executive department and judiciary, to the credit of which there remained but $350 unexpended. As he ordered an alternative mandamus to issue in respect to this claim, I do not see what we have to do with it upon this appeal, which is an appeal from the peremptory mandamus.

This leaves, deducting the $390, $4,404 43, which should have been allowed, approved and paid, and the mandamus, modified to this amount, should stand.

J. F. DALY, J.—I cannot agree in all the views expressed in the learned opinion of the Chief Justice, but concur in affirming the order for peremptory mandamus after reducing the amount for which the mandamus issues by the sum of $390. Following the decision of the general term of the Supreme Court in this district, in the late case of *The People ex rel. Brown* v. *Green, Comptroller*, approving the decision of Judge Sutherland in *The People ex rel. Kelly* agst. *Haws* (12 Abb. Pr. 200), and the decision in *The People ex rel. Haskell* v. *Green*, in this court (special term), and disapproving *People* v. *Flagg* (15 How. Pr. 553), I conclude that the duty and powers of the finance department and its officers, under the act (L. of 1870, chap. 190, sec. 6), extends no further than the examination and allowance or disallowance of the vouchers presented to that department for a claim already audited by the board of supervisors. Such power in the county auditor and comptroller extends no further than an inquiry as to whether: 1st. The claim so audited by the supervisors was a valid legal county charge. 2d. Whether the amount at which the claim was audited by the supervisors was in excess of the proofs before the board. 3d. Whether the audit of the board was without the account or items of charge required by the statute.

Where the board of supervisors acts upon a claim which is a legal county charge by allowing a sum to the claimant justified by the proofs before them, and their action has not been fraudulently procured, their audit is final and conclusive. (*cases above cited and authorities referred to in them.*)

LOEW, J., concurred with DALY, Ch. J.

Order affirmed as modified.