In the Matter of the Estate of GEORGIE H. GENTRY, Deceased.

Surrogate's Court, Kings County, March 31, 1931.

760

*Joseph E. Keenan,* for the petitioner.

*Henry M. Powell,* for the objectant.

Wingate, S. A recital of the actions of the accountant in this proceeding does not paint an attractive picture. Not only has he personally appropriated and squandered all of the personal assets of his intestate mother, but he has sought to foreclose any possible inheritance by the infant child of his deceased brother, *first,* by a conveyance to his mother-in-law of the decedent's realty, and *second,* by the interposition, allowance and alleged payment as administrator of a claim the nature and payee of which are of wraithlike intangibility.

The intestate died on February 20, 1929. Six days later, Oakley Gentry, her son, petitioned for the issuance of letters of administration, which were granted him on the same date. This petition alleged that the personalty of the deceased was worth not in excess of $250 and that her realty was valued at about $8,000. The real property referred to was a house at 337 Forty-seventh street,

Brooklyn, where the decedent had lived and conducted a boarding house for many years.

At the time of her death, title to this real property stood in the decedent's name. There was also an account to her credit amounting to $6,021.95 in the Franklin Savings Society, and two small accounts in other savings banks. It is also alleged in this proceeding that she owned two diamond rings, a pair of diamond earrings and a diamond brooch, besides other personal property.

On March 7, 1929, this son caused to be recorded a deed to the Forty-seventh street premises, alleged to have been given him by the decedent the previous November. It may be noted in passing as bearing upon his general *bona fides* that nine days previously he had sworn in effect that this property belonged to the decedent; that the acknowledgment of the deed is claimed to have been taken before a person now dead; that although the son admitted the return of the deed to him, after recording, he insisted that he had surrendered it to the same deceased person without receipt, and that he had been unable to get it back. He subsequently conveyed the property.

The Franklin Savings account was opened by this decedent on January 10, 1920 in her own name. On March 15, 1929, its title was changed to the estate of Georgie H. Gentry, Oakley Gentry, administrator. On April 1, 1929, the administrator, by aid of a transfer tax waiver and certificate of this court of his appointment, withdrew the entire sum in cash. The drafts by which this withdrawal was effected were signed by him " Estate of Georgie H. Gentry, Oakley Gentry, Administrator." According to his own testimony, he opened an account in his own name with the proceeds and has since that time completely spent them.

In his petition for administration, Gentry alleged that the only other next of kin of the decedent was Herbert Clarke Gentry, the infant grandson of the decedent. In May, 1930, a proceeding was instituted on behalf of this infant to compel Gentry to file a bond for $10,000, and on June third an order of this court to that effect was made and served upon him. Having failed to comply with that direction, he was removed and ordered to account, and on August twenty-third, May A. Gentry, the mother of the infant, was appointed administratrix d. b. n.

The first order directing Oakley Gentry to account was made on May 27, 1930, and served on June tenth. This called on him to account by June thirtieth. It was ignored. On July sixteenth he was directed to show cause on July twenty-third why he should not be punished for his disobedience. The petitioner was unable to procure service within the prescribed time, and a similar order

was made on August second, which was served on the eighth. On September tenth he filed an account with petition for its settlement and the voluntary and involuntary proceedings were consolidated.

The account filed shows as its only assets collections from two savings accounts aggregating $188.78. On the credit side there are listed four items for funeral expenses, two of which were admitted on the hearing to be incorrect. Their total was $668.40. Listed debts aggregated $5,103.70. These comprised fifteen items, it being later admitted that one of the larger ones could not be supported by proof, and that two others were incorrectly listed. Nine of the remaining fourteen totalled only $48.34, and the names of the alleged payees of seven of the amounts were not given.

The accountant, in Schedule G, recited his withdrawal of the $6,021.95 in the Franklin account, claiming that the funds belonged to him in his personal capacity.

The objections as filed center on four matters:

1. The personal claim of the removed administrator to $397.95 alleged to have been paid by him for the funeral expenses of his father.

2. The alleged payment by him to " Conrad Olsen, formerly 337–47th Street, Brooklyn, New York, for debt due him from decedent $4,400.00."

3. The failure to include in the assets of the estate the $6,021.95 in the Franklin Savings account; and

4. The failure to include two diamond rings, diamond earrings, diamond brooch and other personal property of the deceased.

On the record, the first and fourth objections, as enumerated, are capable of ready determination. The father, Herbert Oakley Gentry, died on October 28, 1928. His life was insured in the Penn Mutual Life Insurance Company in favor of his wife, the present decedent, and on November 2, 1928, she received a check in the sum of $2,026.32 in settlement of her insurance claim, which this son indorsed with her name and deposited in his own bank account. On November 12, 1928, two checks, drawn by him on this account, were paid, the first of $397.95, and the second of $1,643.37, giving the same total as the insurance check. The former was sent to the undertaker, and is the amount of his bill for which credit herein is claimed. The second was to the widow, and was on November 10, 1928, deposited in her account in the Franklin Savings Society. It was, therefore, conclusively demonstrated that this funeral bill was not paid by the accountant herein as claimed in his account but that the moneys for its payment belonged to the mother and formed a part of the collection of the insurance on the father's life.

It was proved by three disinterested, corroborated, unimpeached witnesses that the decedent was the owner, at the time she was taken to the hospital, of two diamond rings, a pair of diamond earrings and a diamond brooch, and that at least the rings, contained in decedent's pocket book, were taken by the accountant's wife with the words, " I will take this pocketbook home with me for safekeeping." She admitted its possession. It further appeared that decedent occupied the whole house at 337 Forty-seventh street, and that it contained other personal property. None of this property is accounted for.

The next question concerns the account in the Franklin Savings Society. This was opened by the decedent and continuously stood in her name until after her death. As it is claimed by the accountant as an individual, the burden is on him to prove his title thereto. This he has utterly failed to do. Any rights by him therein must be predicated either on a gift thereof by the decedent, or by reason of a constructive or resulting trust to be spelled out of the facts proved. No effort was made to demonstrate that a gift had taken place. It is true that the accountant's wife testified that she had once seen the bank book in his possession and said that the decedent in referring to it stated (S. M. p. 71), " You don't have to worry. You shall never be deprived of anything," but this testimony, even if entitled to credence, which is doubtful, fell far short of establishing a gift. (*Matter of Booth*, 215 App. Div. 516, 522; *Matter of Ehlers*, 133 Misc. 424, 426; *Matter of Roos*, 132 id. 335, 336; *Matter of Carlson*, Id. 748; *Matter of Beare*, 122 id. 519, 522; affd., 214 App. Div. 723.)

To give rise to a constructive trust, fraud, actual or constructive, is a necessary element. As is said in *Peppard Realty Co., Inc.*, v. *Emdon* (204 App. Div. 8, 10): " The fraud must, however, be something more than the breach of a contract, however inequitable. It must inhere in the very act by which the defendant secured the property. The property must be secured from plaintiff by the fraud, active or constructive, of the defendant." (See, also, *McNeill* v. *McNeill*, 137 Misc. 576, 578.)

The record is bare of the slightest shred of evidence suggesting fraud. Indeed the mere suggestion that this hardworking, old woman was capable of overreaching the mature, sophisticated business man, whom his appearance and testimony demonstrated the accountant to be, is absurd in the extreme.

The theory of resulting trusts, in so far as it may still persist in view of section 94 of the Real Property Law, is of doubtful application to a case like the present, even if all factual issues are resolved

in favor of the accountant. This is indicated by the fact that the accountant fails to cite a single authority in its support.

Without going into an extended examination of the subject of resulting trusts, it will suffice to note their general description as stated by the chancellor of New Jersey in *Aller* v. *Crouter* (64 N. J. Eq. 381; 54 Atl. 426, 429): " Resulting trusts have been considered, since the decision of LORD HARDWICKE in *Lloyd* v. *Spillet*, 2 Atk. 148, to fall naturally within one of three classes, and the distinction has frequently been recognized by our courts. One class of such trusts arises when title to lands purchased, in whole or in part, with the money of one is taken in the name of another. \* \* \* Another class of such trusts arises when a trust is declared in respect to a portion of the title of lands, and nothing is declared with respect to the remainder. \* \* \* The remaining class \* \* \* is that where title to lands is acquired by fraud."

Waiving for the moment, however, the obvious inapplicability to the facts of the present case of the theory on which the bank account is claimed by the removed administrator, it is firmly established that a claim of this sort first asserted against a decedent's estate, particularly by its fiduciary, must be established by a preponderance of clear and satisfactory evidence. (*Townsend* v. *Crowner*, 125 N. Y. Supp. 329, 331, and cases cited, not officially reported; affd., 145 App. Div. 906; *Reppert* v. *Hunter*, 106 Misc. 407, 415; affd., 191 App. Div. 936.) While the accountant showed that the proceeds of certain of his checks went into this account, it was amply demonstrated in rebuttal that contra items from insurance payable to the widow and loans by her to the accountant substantially counterbalanced them.

Even were this not as satisfactorily shown as it was, the principle would govern that the son, having commingled his funds with those of the decedent in her existing personal account, must be held to have voluntarily impressed them with the same character possessed by the moneys already contained therein. (*Matter of Kive*, 139 Misc. 273.)

It follows that the account in the decedent's name in the Franklin Savings Society was the property of the decedent's estate and that the accountant's diversion thereof was a devastavit for which he must be held responsible.

Of the formal objections, there remains only the question of the alleged payment of $4,400 to Conrad Olsen and the credit claimed therefor. This raises an interesting and somewhat novel question or series of questions.

The reference to this alleged payment, contained in the accounts, is found in Schedule D, and reads: " Conrad Olsen, formerly

337–47th Street, Brooklyn, New York, for debt due him from decedent $4400.00."

Pursuant to the provisions of section 263 of the Surrogate's Court Act, the respondent demanded that vouchers be produced for all payments alleged by the accountant to have been made.

The only "voucher" for such payment consists of an unacknowledged receipt, which was admittedly typewritten by the accountant himself. It is on a slip of paper three and one-fourth by four and three-fourths inches in size, evidently detached from a package receipt pad, and reads:

" *Received from* Oakley Gentry

" *For*

" *in good order, the following packages:* Four thousand and four hundred Dollars ($4400.00) in full payment for all claims which I may have against Georgie H. Gentry.

" C. OLSEN "

The italized portions of this slip are printed, the alleged signature is pen written and the balance is typewritten.

It will be noted that the only stated identification of the alleged payee is that he " formerly " resided in the house of accountant's mother.

Whereas, the point was not advanced at the hearing, an examination of this alleged receipt demonstrates that several letters in the purported signature, which is the only portion thereof written in pen, bear a striking resemblance to the same letters found in the administrator's signature, a number of examples of which are found in the record of the case.

It is the claim of the accountant that by reason of his allowance and alleged payment of this purported claim to " C. Olsen," section 210 of the Surrogate's Court Act imposes upon the objecting parties the burden of proving that the payment was not made or that it was fraudulently or negligently allowed or paid.

This section, in so far as here material, reads as follows: " Whenever upon any accounting or judicial settlement of an account, the executor or administrator admits and allows a claim or debt against the deceased, other than his own claim, or has theretofore in writing admitted or allowed such a claim or debt, the validity of such claim or debt shall be thereby established.

" When such a claim or debt has been so admitted or allowed, * * * any party adversely affected thereby may file objections thereto and may show that the claim or debt was fraudulently or negligently allowed, or paid. * * *"

The wording of this statute, standing alone, would, as a matter

of first impression, seem to give some support to the contention of the accountant. It cannot, however, be doubted that it was foreign to the intention of the Legislature, in its enactment, to place it in the power of a dishonest fiduciary to interpose such a serious obstacle in the way of the rightful heirs of an estate as would result from such a construction. His mere act of listing a wholly fictitious item would, if such position be sound, impose upon rightful claimants, necessarily imperfectly informed of the facts, the difficult and frequently impossible task of proving a negative — that the claim was not just or had not been paid.

In his illuminating essays on "The Nature of the Judicial Process," Judge CARDOZO, speaking of law and obedience to law, says (at p. 127): "If the result of a definition is to make them seem to be illusions, so much the worse for the definition; we must enlarge it till it is broad enough to answer to realities. The outstanding truths of life * * * are not to be argued away * * * when they do not fit within our little moulds. If necessary, we must remake the moulds. We must seek a conception of law which realism can accept as true."

This profound truth, liberally applied, should impress upon the court, when an apparently applicable rule of law produces manifest injustice, the necessity of re-examining the question in the search for some other equally pertinent principle producing a more righteous result.

Prior to the decision of the Court of Appeals in *Matter of Taylor*, which will hereinafter be referred to, the precise effect of this statute as bearing upon a situation such as is here presented had never been determined. In the present case no proof of claim was filed with the administrator by the alleged claimant, nor, so far as the record shows, was any proof given by him to the accountant of the validity of the claim. A somewhat similar situation was presented in *Matter of Goepel* (200 App. Div. 678), in which the court avoided the decision of the question of the effect upon the burden of proof of the allowance and payment of a claim under circumstances similar to those here present, saying (at p. 679): "It was not shown that a formal verified claim for this indebtedness was presented to the appellants, as might have been required by them (Code Civ. Proc. § 2677, formerly § 2718, and now Surr. Ct. Act, § 207), or that the appellants took or filed with their accounts any vouchers for these payments. (See Code Civ. Proc. § 2731, now Surr. Ct. Act, § 263.) If the claim was formally presented, allowed and paid and a voucher taken therefor, then the burden of disproving it would have been on the party objecting to the allowance thereof. (*Matter of Frazer*, 92 N. Y. 239; *Boughton*

v. *Flint*, 74 id. 476; *Matter of Warrin*, 56 App. Div. 414; *Matter of Sprague*, 40 id. 615.) "

In *Ulster County Savings Institution* v. *Young* (161 N. Y. 23) the court says (at p. 33): " The almost universal practice in presenting claims to representatives of an estate, to public officers or public boards, whether executors, administrators, assignees, receivers, supervisors, aldermen or auditors, has been to present them in writing, properly verified by the claimant. In many of the instances mentioned, this is specially required. In this case there is no such explicit requirement, but the language of the statute clearly indicates that the claim exhibited must be in writing. Public policy and certainty in the administration of estates also require the enforcement of that rule. Otherwise the opportunity is at once presented for an unscrupulous or dishonest representative to claim the benefit of this statute from some uncertain and inconclusive talk in regard to a claim against the estate, which upon a trial may be transformed into an absolute demand and refusal, by perjury or a mistaken remembrance of the facts. In a matter so important, we think nothing short of a written claim exhibited to the representative, as the statute plainly requires, and absolutely rejected by him, will have the effect of establishing the time for the commencement of the limitation provided by this statute."

It will be noted, however, that this determination did not concern the rights of the administrator himself, but related to the Statute of Limitations applying against a creditor.

In *Matter of Morton* (58 N. Y. St. Repr. 515, 517) the following language is found: " The statute plainly intends that the claim shall be *presented* or *exhibited* in some writing, stating its nature and amount, the owner's name and demanding its payment. The personal representative of the estate is then in possession of information which will enable him to act intelligently, and either to admit the claim or take such steps to protect the estate against it as he shall deem prudent and necessary."

In *Matter of Morton* (7 Misc. 343, 346) it was said that a claim, to be properly exhibited or presented to an estate fiduciary, should be in writing, which thought is further developed in *Matter of Brown* (60 Misc. 35, at p. 38) in the following language: " The personal representative of an estate is a trustee of the assets for the benefit of creditors and distributees. The rights of creditors, being prior to those of next of kin or legatees, the first duty of the representative is to ascertain and liquidate the indebtedness. The statute provides an expeditious and satisfactory mode of procedure in developing the indebtedness. Code Civ. Proc., § 2718. The terms ' presentation ' and ' allowance ' of claims in connection

with administration are not mere vague and shadowy expressions; they each have a well-defined legal signification. The representative, in passing upon the validity of claims against the estate, acts in a *quasi* judicial capacity; he should have some basis for such action other than assumed personal information. The basis contemplated by the statute is afforded by the claimant presenting to the representative a written statement of his demand, showing the amount and what it is for; the representative may require such statement to be verified."

On the other hand, in *Matter of Frazer* (92 N. Y. 239) the allowance of a claim by executors was upheld, although it might have been defeated by the interposition of a plea of the Statute of Limitations where it was shown that the claim, in its inception, was a valid obligation of the decedent.

The extent to which personal knowledge by the executor of the validity of a claim will be given weight in connection with its allowance in his accounts, is in some confusion.

On the one hand it was determined in *Matter of Smith* (153 N. Y. 124) that such personal knowledge did not justify the payment of a claim, whereas the contrary result is reached in *Matter of Eddy* (134 Misc. 112, 114) and certain other cases, the theory of the *Smith* case being that under the facts there presented, such knowledge amounted to a personal transaction with the decedent which rendered such knowledge unavailable for testimonial purposes. *Matter of Smith* was applied and followed by Surrogate FOWLER in *Matter of Mulligan* (82 Misc. 336, 340).

Additional light is shed upon the general subject by the recent determination of the Court of Appeals in *Matter of Taylor* (251 N. Y. 257). There, certain purported notes were presented to the executors for allowance, and were allowed. These notes had been given as voluntary subscriptions to a charitable enterprise during the decedent's lifetime.

The Court of Appeals in reversing the judgment below, which allowed the notes as valid claims against the estate, used the following language (at p. 262): " The duty of executors clearly does not permit them merely by allowing or paying claims against the estate without regard to their character to shift the burden of proof upon objectors. They are still bound to the exercise of proper care. They must act on satisfactory proofs that the claim is justly due. (Surrogate's Court Act, § 207.) What is satisfactory proof depends upon the nature of the claim. If its nature is equivocal or suspicious, payment may be withheld until the claim is tried. (Surrogate's Court Act, § 211.) "

At page 263: " As the evidence of the notes themselves is not

of sufficient weight and character conclusively to establish their validity, the question remains as to the duty of the executors to investigate before paying. While it cannot be said that any suspicion of fraud or bad faith in fact attached to the giving of the notes, the conclusion seems irresistible that the executors may not escape responsibility for inquiry into their validity by relying on the words 'for value received.' Reasonable diligence and intelligence on their part were called for."

At page 264: "The executors have failed to establish their freedom from negligence in paying the notes. It seems a reasonable and necessary inference from the evidence that the notes were paid without inquiry as to their true character in order to impose the burden of proof of their invalidity upon the objectors and that counsel advised their payment to accomplish that end. This is not the exercise of care and solicitude for the rights of all interested in the estate which the law imposes on the executors of a will."

The natural result of the language quoted would seem to be that in order to shift the burden of proof respecting the propriety of allowance of a claim to objecting parties, such allowance must be based upon satisfactory proof that the obligation in question is a valid claim against the estate; and that the burden is imposed upon the executor to demonstrate not only that the claim was proper, but that he was free from negligence in its payment.

However this may be in the ordinary case, it is believed that the provisions of section 263 of the Surrogate's Court Act are such as to impose the burden upon this administrator of demonstrating by a preponderance of evidence that this claim and alleged payment were both valid and actually made. So far as here applicable this section reads: "If any party interested shall demand in writing that a voucher be produced and filed for any payment alleged by the account to have been made, the accounting party shall produce and file such voucher or make satisfactory proof of such payment."

Obviously under the terms of the statute the burden is imposed upon the administrator to "make satisfactory proof" unless a "voucher" is produced. The question then arises as to what is meant in the statute by the word "voucher." This question has never been determined in this State by any directly authoritative decision.

In *People* v. *Green* (5 Daly, 194) the following language appears (at p. 199): "What is a voucher? The word has several meanings; but, in its ordinary signification, it means a document which serves

to vouch the truth of accounts, or to confirm and establish facts of any kind. * * *

" The voucher is necessarily the account or claim, with the attestation, in some form or other, of the board of supervisors, that it is a valid charge against the county."

That decision is not a direct authority since it applied to questions of vouchers for supplies in the finance department of the city of New York.

*State ex rel. Dales* v. *Moore* (36 Neb. 579; 54 N. W. 866) yields the following statement by the Supreme Court of Nebraska (at p. 583): " The term ' voucher,' when used in connection with the disbursement of money, means a written or printed instrument in the nature of a bill of particulars, account, etc., which shows on what account and by what authority a particular payment has been made."

A somewhat similar definition in a case involving related facts is found in *People* v. *Swigert* (107 Ill. 494, at p. 504).

The best exposition, however, which the court has found is contained in a pertinent case respecting decedents' estates in the decision of the Supreme Court of Oregon in *Willis* v. *Marks* (29 Ore. 493, 502; 45 Pac. 293, 296). The court there says: " when funds of the estate are disbursed the administrator is required to accompany his report of such disbursements with proper vouchers. For the ordinary expenses incurred in the settlement of the estate, a receipt from the party to whom the money is paid, showing for what the payment was made, would undoubtedly constitute a proper voucher; but the receipt alone could not be said to be a sufficient voucher for money paid out on a claim arising out of transactions with the party whose estate is being settled, as the court may not approve the payment upon the receipt alone, while it could and would ordinarily if accompanied by the verified claim. So that it would seem that the verified claim and receipt showing the payment, whether in whole or in part, would together constitute a proper voucher in such a case."

In the opinion of the court the word " voucher," as used in section 263 of the Surrogate's Court Act, has the precise meaning given to it by Supreme Court of Oregon in the case last cited. The purpose of the various statutes relating to the presentation and allowance of the claims against decedents' estates are obviously designed to protect both the representative and the estate itself. In section 207 of the Surrogate's Court Act the following language appears: " The executor or administrator may require satisfactory vouchers in support of any claim presented and the affidavit of the claimant that the claim is justly due, that no payments have

been made thereon, and that there are no offsets against the same to the knowledge of the claimant." Such a requirement is obviously for the benefit both of the estate and of the fiduciary to enable the latter to resist fraudulent and unfounded assertions of indebtedness. Whereas it is necessary and important that an executor or administrator should be protected from unjust exactions both by alleged creditors of the decedent and by persons interested in the estate, it is primary that his fiduciary relationship to the estate is of a very high order, and a construction of section 210 which would permit a dishonest representative to cast upon those to whom he owes the duty of *uberrima fides* the obligation of proving a negative in cases in which an honest representative will avail himself of his statutory right to inform himself prior to making payment, is not to be adopted where another conclusion is possible.

It is the opinion of the court that a reasonable construction of section 210 of the Surrogate's Court Act, particularly in view of the decision of the Court of Appeals in *Matter of Taylor*, is to impose upon the representative the primary burden of demonstrating that any claim paid or allowed by him is *prima facie* valid and justly due from the estate of the decedent, at least to the extent of requiring him to present the evidence thereof which he is authorized to exact under the provisions of section 207; and that the voucher referred to in section 263 is not supplied in the absence of similar supporting proofs.

If this conclusion is correct, it must follow that in the case at bar no voucher within the contemplation of the act was filed, wherefore, by the terms of the statute, the burden was imposed upon the administrator of proving the fact and propriety of the alleged payment to " C. Olsen " by " satisfactory proof." Before considering the facts shown by the record relating to the validity and fact of payment of this alleged claim, it will prove of advantage to note certain additional circumstances appearing on the record and from the evidence in respect to the matter.

As heretofore noted, the accountant shows as assets of the estate only the sum of $188.78, which sum was more than exhausted by the payment of the preferred undertaker's bill which amounted to $549.40, although listed in the accounts as $594.40. It is, therefore, obvious that this alleged payment to Olson, if actually made, must have been paid from the personal funds of the accountant, and, indeed, he so claims.

The result, therefore, is that the accountant in this proceeding is not here seeking a credit from the funds of the estate which have been in his hands for a disbursement of a part of them. He is in reality presenting a claim against the estate on his own behalf,

to the end that it may be established as a lien against his mother's real estate if the extremely suspicious deed under which he purported to convey it as an individual shall be declared fraudulent and void and set aside.

In such a situation it would seem that the position of the administrator in regard to this alleged claim was merely that of one subrogated to the rights, if any, of the original claimant. Only one case bearing upon this question has been found. This is *Vulte* v. *Martin* (44 How. Pr. 18), in which the court says (at p. 25): "As to the claim of the defendant to be allowed for debts of the estate paid by him out of his means, the only way he can be allowed for them is to treat him as an assignee of such debts, and to allow him the share to which such debts would be entitled, had they remained in the hands of the original creditors." If this position be sound, as it would seem to be, the result follows that the claim of the accountant in this regard falls within the provisions of section 212 of the Surrogate's Court Act, requiring its express proof before, and allowance by, the surrogate. In this view, also, the burden would be upon the accountant to establish the validity of the demand.

The applicable legal principles being determined, the facts elicited upon the hearing will now be reviewed.

When examined in respect to this Olsen claim, the accountant stated that he thought Olsen was in California; that he formerly lived in the decedent's house at 337 West Forty-seventh street, Brooklyn. The description of this ephemeral individual was as illusive as his whereabouts. The accountant described him as being of medium height, smooth shaven, about sixty years of age, hair "mixed." He did not remember the color of his eyes and although he testified that the individual had lived at the Forty-seventh street address at different times, not specified, at which house the accountant long lived and to which he was subsequently a very frequent visitor, he stated that he had never seen him with his hat off, and consequently did not know whether he was bald or not. The proceeds of the obligation, whether a loan or otherwise, forming the basis of the alleged debt of the decedent to Olsen, the accountant testified, had never been deposited in any bank and he refused to state the consideration for the alleged claim. He admitted that he had not secured any affidavit of claim and that he had in his own office personally typed the slip submitted as a voucher. The alleged payment by him was not made by check, although he admitted on cross-examination that no other claim against the estate for more than $100 had been paid by him except by check. He claimed that this payment was made by him by delivery of

$4,400 worth of negotiable government bonds in $50 and $100 denominations, but did not recall whether these bonds were Liberty or Federal bonds or their description. He stated that he had kept these bonds, prior to the payment, in his own house and had cut the coupons from time to time and used them, but did not recall that he had ever deposited any of them in any bank account of his. When pressed as to the time he had acquired these bonds his testimony was evasive and to the effect that some were bought before, and some after the war.

The only corroboration of this testimony, if it may so be termed, was given by the accountant's wife who testified that some five or six years before she had overheard a conversation between the decedent and the accountant during which the decedent stated that she wished $1,000 to pay Olson; but that her son objected to her doing so. When questioned on the subject, she said that she did not remember what the decedent wished to pay him for.

As against this testimony the objecting parties introduced three witnesses, Mrs. Dora Leonhardt, Mrs. Sarah Spear and Mr. Peter Peterson. The first two had been on intimate terms with the decedent since 1917, and demonstrated a detailed acquaintance with the affairs of the decedent and the various individuals who had been boarders in her house during that period. Mr. Peterson boarded at the house of the decedent from 1914 to 1920, since which time he had resided across the street and had continued on intimate and confidential terms with her. All three of them testified categorically that during the several periods, namely, from 1917 to the time of the death in the case of the first two witnesses, and from 1914 until the death in the case of Mr. Peterson, there had been no person residing in the house of the decedent or known to them — and they knew all such individuals — by the name of Conrad Olson. All of them testified, however, that in or about the year 1924 an individual by the name of Nils Olson became a roomer at the decedent's house and remained there until 1927, when he left this country to return to his former home in Norway. This person was a man of approximately fifty-five years of age who did not in any particular correspond with the meagre description of the illusive Conrad Olson given by the accountant. Mr. Peterson further testified to a conversation with the accountant respecting Conrad Olson and stated that the latter had said to him that he, Peterson, did not know him. Considerable testimony was also introduced respecting fruitless efforts to locate any Conrad Olson.

If it were necessary to base a decision in this matter solely on the credibility, on the one hand, of the removed administrator and, on the other, of these three witnesses, the court would have

no hesitancy in determining that issue against the accountant and in holding that this alleged Conrad Olson was a wholly fictitious person. Not only were the three witnesses for the objectors wholly without personal interest in the transaction as against the vital interest of the accountant, but the record is replete with instances of the utter untrustworthiness of Oakley Gentry's sworn statements. For example, he testified at page 41 of the record that he was never served in any action, although admitting that he had been in partnership with an individual by the name of Dusenberg; yet it was shown by respondent's Exhibit 4 that a judgment in the sum of $1,449.56 was recovered against both him and Dusenberg on April 3, 1924, executions upon which were returned unsatisfied on April 29, 1924, and May 29, 1930. His perjury respecting the payment of his father's funeral expenses has already been pointed out, and additional examples of like nature might be cited were it worth the effort.

As a result, even were the burden on the respondent to show that the alleged payment to Conrad Olson had not been made, the record, in the opinion of the court, amply establishes the point. This item of the account and Oakley Gentry's claim in that regard are consequently disallowed.

On the hearing it was further shown that on March 7, 1929, the accountant collected the proceeds of certain industrial insurance policies in the Metropolitan Life Insurance Company on the life of the decedent, aggregating $365.75; he has not accounted for this sum and his account will be surcharged therewith with interest from the date of collection.

The accountant has demonstrated his utter faithlessness as a fiduciary. He obtained custody of the estate upon a perjured petition, and has attempted in every conceivable fashion to loot it and defraud his coheir, the infant son of his deceased brother. For this reason commissions are denied him and costs will be awarded against him personally.

The decree to be entered herein will charge the accountant in addition to the items enumerated in Schedule A with the sum of $6,021.95, the amount withdrawn by him from the Franklin Savings account, and interest at six per cent thereon from April 1, 1929, the date of its conversion, and with the proceeds of the Metropolitan Life Insurance Company policies amounting to $365.75, with interest at six per cent thereon from March 7, 1929, the date of their receipt.

Against the total of those sums, he will be credited with the amount of Schedule C, as amended on the hearing, amounting to $661.85, and with the amount of Schedule D, as amended, less

the claimed credits for the funeral expenses of his father and the alleged payment to Conrad Olson; in other words, a total of $208.41.

He will be directed to pay over to the administratrix d. b. n. the amount of this revised Schedule A, to be determined upon the computation of interest to the date of the entry of the decree, as hereinbefore directed, less the allowed amounts as above, of Schedules C and D, aggregating $870.26, and he will further be directed to pay to said administratrix d. b. n. her costs and the disbursements of this proceeding.

He will further be directed to turn over to the administratrix d. b. n. the two diamond rings, the pair of diamond earrings and the diamond brooch belonging to the decedent.

The other items of personal property belonging to the decedent have not been proved with sufficient definiteness to warrant a direction in respect to them, and if the administratrix desires to have them included in the decree the matter will have to be brought on by her for further hearing on this question unless the parties can stipulate as to their identity, in which event the administrator will be directed to deliver them also. Proceed accordingly.